## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YANKTON SIOUX TRIBE, a federally
recognized Indian Tribe; and ROBERT
FLYING HAWK, Chairman of the Yankton
Sioux Tribe Business and Claims Committee;
    800 S Main
    P.O Box 1153
    Wagner, SD 57380
        Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS;
    U.S. Army Corps of Engineers
    441 G Street NW
    Washington, DC 20314-1000
and LIEUTENANT GENERAL TODD
SEMONITE, in his official capacity as
Commanding General and Chief of Engineers
for the United States Army Corps of Engineers;
    U.S. Army Corps of Engineers
    441 G Street NW
    Washington, DC 20314-1000
COLONEL JOHN W. HENDERSON, in his
official capacity as United States Army Corps of
Engineers Omaha District Commander;
    Omaha District, USACE
    1616 Capitol Ave., Ste. 9000
    Omaha, NE 68102
COLONEL ANTHONY MITCHELL, in his
official capacity as United States Army Corps of
Engineers St. Louis District Commander;
    St. Louis District
    1222 Spruce Street
    St. Louis, MO 63103-2833
UNITED STATES FISH AND WILDLIFE
SERVICE; and DAN ASHE, in his official
capacity as Director of the United States Fish
and Wildlife Service,
    U.S. Fish and Wildlife Service
    1849 C Street, NW
    Room 3331
    Washington, DC 20240
        Defendants.

Civil Case No. 16-1796

**COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     This is an action for injunctive and declaratory relief by which Plaintiffs Yankton Sioux Tribe and the duly elected chairman of its Business and Claims Committee, Robert Flying Hawk (jointly, "Tribe") seek both declaratory and injunctive relief to prevent Federal Defendants from violating the substantive and procedural requirements of the National Historic Preservation Act ("NHPA"), the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), the 1851 Treaty of Fort Laramie ("1851 Treaty"), and the Administrative Procedures Act ("APA") through their various decisions, approvals, and verifications under these statutes for the proposed Dakota Access Pipeline ("DAPL" or the "Pipeline").

2.     DAPL is a proposed crude oil pipeline that would run approximately 1,168 miles from North Dakota, through South Dakota and Iowa, and into Illinois.

3.     As currently conceived, DAPL would pump a minimum 570,000 barrels or over 2 million gallons of crude oil per day from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois, and ultimately to refineries located in the Midwest and the Gulf Coast.

4.     The Pipeline will be one of the largest crude oil pipelines in the nation, carrying over half of the current capacity of North Dakota's oil production.

5.     DAPL is one of several pipelines proposed for North Dakota's oil production area.

6.     The Pipeline's route passes through the Tribe's ancestral homeland, treaty territory, aboriginal title lands, and other areas of significant cultural, religious and spiritual significance.

7.     Approximately 38 miles of the Pipeline route pass through treaty territory belonging to the Tribe and to other member tribes of the *Oceti Sakowin*, or "Great Sioux Nation."

8.     Pipeline construction requires clearing and grading a permanent 1,168 mile 100-150 foot thoroughfare, digging a trench as deep as 10 feet, building and burying the 30-inch diameter pipeline, and permanent maintenance of a 50-foot right of way above the Pipeline.

9.     Pipeline construction will permanently destroy sites of enormous cultural importance to the Tribe and its members including burial grounds, sacred sites, and other areas of cultural and historic importance to the Tribe.

10.    Once constructed, the Pipeline poses an imminent threat for leaks and spills, environmental contaminations that are commonly associated with both old and new pipelines.

11.    The Pipeline will cross six wetland and grassland easements in North Dakota and 112 wetland and grassland easements in South Dakota impacting a total of 71.8 acres of wetlands easements; 23,619 feet and 30.34 acres of projects and flowage easements under the jurisdiction of the Army Corps of Engineers ("Corps") St. Louis District; and 3.04 miles of projects and flowage easements under the jurisdiction of the Corps Omaha District. In addition, the Pipeline will cross more than 200 locations containing waters of the United States up to ½ acre in size.

12.    Instead of conducting a coordinated approach and issuing a consolidated decision, the Federal government's decision-making and approval process for the Pipeline has been a labyrinth of fragmented and piecemeal decisions by multiple Federal agencies. The Federal government's approach has led to a complete absence of meaningful consultation with the Tribe on the environmental and cultural impacts of the proposed Pipeline – consultation that could have resulted in the adoption and implementation of reasonable mitigation measures.

13.    In August of 2016, the Corps St. Louis District released a Final Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") purporting to analyze the crossing of federal Corps projects including McGee Creek levee west of the Illinois River (Pike

County, IL), the navigation channel of the Illinois River (Pike and Morgan counties, IL), and the Coon Run levees east of the Illinois River (specifically, Coon Run Northwest levee and Coon Run Southeast levee) (Scott County, IL). The Pipeline will cross a total of 30.34 acres of projects and easements under the jurisdiction of the Corps St. Louis District.

14. In June of 2016, Defendant U.S. Fish and Wildlife Service ("FWS") released an EA and FONSI covering authorization to cross approximately 417.3 miles of grassland and wetland easements in North and South Dakota.

15. In July of 2016, the Corps Omaha District released an EA and FONSI. The Corps Omaha EA's analysis is limited to the effects of allowing the Pipeline to cross federal flowage easements near the upper end of Lake Sakakawea and federally owned lands at Lake Oahe in North Dakota.

16. In March of 2012, the Corps issued a suite of 50 Nationwide Permits ("NWPs") covering a wide array of Pipeline-related activities involving discharges into regulated waters of the United States and in "most cases" without any further Federal agency involvement.

17. Included among this suite of Federal decisions was Nationwide Permit 12 ("NWP 12"), pursuant to which Dakota Access, LLC sought verifications of more than 200 pre-construction notification ("PCN") sites of up to ½ acre.

18. Upon information and belief, additional Federal approvals are necessary for the DAPL.

19. As set forward herein, Plaintiffs challenge the Corps' decisions to issue the Corps Omaha EA and FONSI and the Corps St. Louis EA and FONSI, and FWS' decision to issue the FWS EA and FONSI, for failure to obtain the Tribe's free, prior and informed consent as required

by the 1851 Fort Laramie Treaty, the federal trust responsibility, and the United Nations Declaration on the Rights of Indigenous Peoples.

20.     Plaintiffs challenge the Corps' decisions to issue the Corps Omaha EA, the Corps Omaha FONSI, NWP 12, and more than 200 PCN verifications for failure to consult with the Tribe pursuant to the NHPA, Executive Order 13175 ("EO 13175"), and agency and departmental policies in the development of the Corps Omaha EA. Plaintiffs further challenge the Corps' decisions to issue the Corps Omaha EA and the Corps Omaha FONSI for defining the scope of the area of potential effects unlawfully narrowly.

21.     Plaintiffs challenge the Corps' decisions to issue the Corps Omaha EA and FONSI, the Corps St. Louis EA and FONSI, the FWS EA and FONSI, and the Corps' NWP 12 verifications of more than 200 PCNs due to the federal agencies' unlawful segmentation of analysis of project components, failure to adequately consider indirect and cumulative impacts, and failing to meaningfully involve the Tribe on a government-to-government basis in an effort to achieve environmental justice obligations in violation of NEPA.

22.     Finally, Plaintiffs challenge the Corps' decision to verify more than 200 PCNs for failure to consider the public interest in violation of the CWA.

23.     Plaintiffs seek orders declaring that Defendants committed the above-described violations of law, vacating and remanding Defendants' unlawful decisions, and enjoining Defendants from re-issuing or reinstating their respective decisions unless and until they have complied with applicable Federal law.

## JURISDICTION AND VENUE

24.     This is a civil action brought by an Indian tribe with a body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, and

treaties of the United States. This Court has jurisdiction over the action under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1362 (action brought by an Indian tribe); 28 U.S.C. § 1343 (protection of civil rights); the APA, 5 U.S.C. § 701 et seq., which authorizes a federal court to find unlawful and set aside any final agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law;" and the Declaratory Judgment Act, 28 U.S.C. § 2201-2202.

25.     Venue in this district is proper under 28 U.S.C. § 1391(e) because it is the district in which Federal Defendants are headquartered and in which "a substantial part of the events or omissions giving rise to the claim occurred."

## PARTIES

26.     Plaintiff YANKTON SIOUX TRIBE is a federally recognized Indian tribe that is not incorporated under the Indian Reorganization Act, but rather, is governed by a duly adopted constitution and by-laws through its General Council. The Tribe is a member of the *Oceti Sakowin* ("Seven Council Fires," also known as the Great Sioux Nation). The Tribe brings this suit on its own behalf and as *parens patriae* on behalf of its members to protect its members' cultural, historic, and environmental interests in the Tribe's treaty territory, aboriginal territory, and ancestral lands.

27.     The Tribe has approximately 9,000 enrolled members.

28.     The Tribe's headquarters is located at 800 Main Avenue Southwest, Wagner, South Dakota 57380.

29.     Plaintiff ROBERT FLYING HAWK is Chairman of the Yankton Sioux Tribe Business and Claims Committee. The claims against Defendants are made in Plaintiff Flying

Hawk's personal and official capacity as *parens patriae* on behalf of the enrolled members of the Yankton Sioux Tribe.

30.     The Pipeline route passes through the Tribe's treaty and aboriginal title lands which are areas of significant cultural, spiritual, and historical importance to the Tribe. Construction of DAPL includes activities such as clearing and grading, digging a trench, and building and burying the pipe, all of which would cause injury to Plaintiffs on a cultural, spiritual, and historical level through the destruction of burial grounds, sacred sites, and other cultural resource sites.

31.     Plaintiffs have an interest in preserving the quality of the water, land, air, flora and fauna within and outside the Tribe's aboriginal title area and treaty territory.

32.     Plaintiffs have significant historical ties to the lands in North Dakota (both within and outside the treaty territory), South Dakota, and Iowa which would be trenched and traversed by the Pipeline.

33.     As a result of the Tribe's rich historical, ancestral, and aboriginal ties to the lands that would be disturbed by the Pipeline, Plaintiffs have substantial cultural, spiritual, and historical interests in these lands that would be devastated by construction of the Pipeline.

34.     In addition to numerous cultural sites already identified along the proposed route, there are countless cultural sites of significance to Plaintiffs that the Corps has not identified.

35.     Destruction or damage to any one cultural, spiritual, or historical resource is an injury to Plaintiffs.

36.     Plaintiffs also have vital ties to the waters of Missouri River, which are used for ceremony and viewed as the "first medicine" by the Tribe.

37.     Of particular importance to Plaintiffs is the location where DAPL crosses the James River. From time immemorial, the Yankton camped up and down the banks of the James River

and as a consequence, burial, cultural, and historical sites remain along the James River that are at immediate risk of irreparable injury as a result of Defendants' actions and Dakota Access, LLP's planned activities.

38.     Defendant U.S. ARMY CORPS OF ENGINEERS is a federal agency charged with administering and enforcing Section 404 of the CWA regarding the discharge of dredged or fill material into waters of the United States and Sections 10 and 14 of the Rivers and Harbors Act ("RHA").

39.     Defendant Corps issued an EA and a FONSI through its Omaha District for two water crossings in North Dakota and prepared a separate EA through its St. Louis District for crossings of the Illinois River, two levee systems, and a flowage easement in Illinois for the Pipeline.

40.     Defendant Corps was responsible for issuing NWP 12, pursuant to which the Pipeline would cross over 200 jurisdictional waters of the United States.

41.     Defendant Corps was responsible for verifying more than 200 PCNs in North Dakota, South Dakota, Iowa, and Illinois for the Pipeline pursuant to section 10 of the RHA and section 404 of the CWA.

42.     Defendant Corps is a component of the Department of Defense ("DOD").

43.     Defendant LIEUTENANT GENERAL TODD SEMONITE is the Commanding General and Chief of Engineers for the Corps.

44.     Defendant Semonite was responsible for reviewing and reissuing NWP 12.

45.     Defendant COLONEL JOHN HENDERSON is the Omaha District Commander for the Corps.

46.     Defendant Henderson was responsible for approving the FONSI for two section 408 permits for the Pipeline's Missouri River crossings in North Dakota.

47.     Defendant COLONEL ANTHONY MITCHELL is the St. Louis District Commander for the Corps.

48.     Defendant Mitchell was responsible for approving the FONSI for the section 408 permit for the Pipeline's various crossings of Corps projects and flowage easements in Illinois.

49.     Defendant U.S. FISH AND WILDLIFE SERVICE is the federal agency that manages wetland and grassland easements that the Pipeline would cross in North Dakota and South Dakota.

50.     Defendant FWS was responsible for preparing an EA and FONSI for a Special Use Permit ("SUP") for the Pipeline.

51.     Defendant DAN ASHE is the Director of FWS.

52.     Defendant Ashe was responsible for overseeing the agency approving the FONSI for the SUP for the crossings of wetland and grassland easements in North Dakota and South Dakota.

### STATEMENT OF FACTS

53.     Plaintiffs reallege paragraphs 1 through 52 and incorporate them by reference.

54.     During the seventeenth century, the Yankton band of the *Oceti Sakowin*, or "Sioux," began moving from eastern present-day Minnesota to eastern present-day North Dakota and northeastern present-day South Dakota.  By the mid-eighteenth century, the Yankton began occupying southeastern South Dakota.  In 1851, along with several other bands of the *Oceti Sakowin*, the Yankton signed a peace treaty (the 1851 Treaty) with the United States which established boundaries of the "territory of the Sioux or Dahcotah Nation" ("treaty territory"),

which consists of vast portions of North Dakota, South Dakota, Wyoming, and Nebraska. The treaty territory is bounded to the north by the Heart River and to the east by the Missouri River.

55.     The Pipeline would cross the Heart River at approximately mile post 126.5 of the Pipeline. The Pipeline would cross the Missouri River at approximately mile post 164.5 of the Pipeline.

56.     The Pipeline would therefore traverse approximately 38 miles of the Tribe's treaty territory. A map showing the route of the Pipeline through the Tribe's treaty territory is attached hereto as "**Exhibit A**."

57.     The Tribe has not authorized Dakota Access, LLC to cross its treaty territory.

58.     The Indian Claims Commission found that the Yankton Sioux Tribe held aboriginal title to a majority of the land known as "Royce Area 410," which encompasses most of southern and central present-day South Dakota east of the Missouri River. A map of the Tribe's aboriginal title territory is attached hereto as "**Exhibit B**."

59.     All of the PCN sites for DAPL within the state of South Dakota lie within this aboriginal title area. A map demonstrating the locations of the PCN sites in relation to the Tribe's aboriginal title territory is attached hereto as "**Exhibit C**."

60.     Dakota Access, LLC claims to have completed cultural resource surveys along the Pipeline route; however, these surveys were performed by non-local and non-Yankton consultants hired by Dakota Access, LLC who, respectfully, do not possess the cultural knowledge to understand the significance of and in some cases even identify sites.

61.     The Tribe was not consulted on protocols that the consultants would follow during the cultural surveys, and those surveys were performed without the participation of the Tribe.

62.     A NWP is a general permit that authorizes activities across the country under CWA section 404(e).

63.     In 2012, the Corps issued NWP 12 authorizing the construction, maintenance, or repair of utility lines and associated excavation, backfill, or bedding in all waters of the United States, provided there is no change in pre-construction contours.  The term "utility line" includes pipelines for the transportation of liquid for any purpose, such as oil pipelines.  Under NWP 12, a permittee is required to submit a PCN to the Corps district engineer prior to commencing activity if any of certain specified criteria is met.

64.     Dakota Access, LLC sought authorization to construct the Pipeline in waters of the United States which are under the jurisdiction of the Corps under NWP 12.

65.     As a result of various anticipated water crossings meeting criteria that trigger the PCN requirement, Dakota Access, LLC submitted PCNs to the Corps for 209 sites along the Pipeline route.  Upon information and belief, some of these PCNs have been withdrawn but the total number of PCN sites still exceeds 200.

66.     On July 25, 2016, the Corps issued verification letters verifying ten PCNs in South Dakota, 62 PCNs in Iowa, and 45 PCNs in Illinois.  Plaintiffs do not have information regarding the number of PCNs issued in North Dakota at this time.   These verifications constitute authorization for Dakota Access, LLC to proceed with construction of the Pipeline at the PCN sites.

67.     There was no ability or opportunity for the Tribe to review or comment on the Corps' verifications and PCN approvals prior to authorization.

68.     Upon information and belief, the Corps is awaiting further information from a cultural resource survey at one PCN site in South Dakota before making a determination about verification.

69.     No EA has been developed for any of the more than 200 PCN sites along the Pipeline route.

70.     No tribal consultation has occurred with respect to the more than 200 PCN sites along the Pipeline route.

71.     No public comment period was held with respect to the more than 200 PCN sites along the Pipeline route.

72.     Pursuant to the RHA, Dakota Access must obtain a section 408 permit in order to construct the Pipeline at two locations in North Dakota where the Pipeline would cross the Missouri River.

73.     With respect to the section 408 permits in North Dakota, the Corps released a draft EA on December 8, 2015.  The Corps released the final Corps Omaha EA on or about July 27, 2016.  The Corps issued the Corps Omaha FONSI on or about July 27, 2016.

74.     The Corps has failed to provide the Tribe with a copy of the Corps Omaha EA or the Corps Omaha FONSI.

75.     With respect to the section 408 permits in Illinois, the Corps released the Corps St. Louis EA and the Corps St. Louis FONSI in August 2016.

76.     The Pipeline will cross wetland and grassland easements in North Dakota and South Dakota, requiring a SUP from FWS.

77.     In addition to the two EAs developed by the Corps, FWS developed a third EA for the Pipeline with respect to grassland and wetland easements.  FWS issued the FWS FONSI on June 22, 2016.

78.     Pursuant to a letter the Corps sent the Tribe on July 25, 2016, Dakota Access LLC was set to begin construction of the Pipeline on July 30, 2016.  The Tribe's tribal historic preservation officer ("THPO") later received an email from Dakota Access LLC on August 8, 2016, notifying the THPO that construction would begin on August 10, 2016. Upon information and belief, construction has now commenced.

79.     On August 3, 2016, the Standing Rock Sioux Tribe filed a complaint against the Corps for declaratory and injunctive relief in the United States District Court for the District of Columbia.

80.     On August 10, 2016, the Cheyenne River Sioux Tribe moved to intervene in the case filed by the Standing Rock Sioux Tribe in the United States District Court for the District of Columbia.  Intervention was granted on August 19, 2016.

## FIRST CLAIM FOR RELIEF

*Violation of the 1851 Treaty, the Federal Trust Responsibility, and the United Nations Declaration on the Rights of Indigenous Peoples*

81.     Plaintiffs reallege paragraphs 1 through 80 and incorporate them by reference.

82.     The Corps and FWS violated the 1851 Treaty, their federal trust responsibilities to the Tribe, and the United Nations Declaration on the Rights of Indigenous Peoples ("UNDRIP") by issuing the EAs, FONSIs, and NWP 12 verifications for PCNs that enable Dakota Access, LLC to construct the Pipeline without first obtaining the Tribe's free, prior and informed consent.

83.     Because the Tribe, as a signatory to the 1851 Treaty, does not consent to construction and operation of the Pipeline, which would traverse its treaty territory, construction

and operation of the Pipeline would constitute a trespass in violation of the 1851 Treaty. While the boundaries of the Tribe's possessory interest in the treaty territory have been diminished by Congress pursuant to its "plenary powers," such alleged powers in fact violate Article VI of the United States Constitution which declares treaties to be the supreme law of the land. Federal approvals for a trespass to the Tribe's treaty territory violate Article VI of the United States Constitution.

84.     The federal agencies' decisions violate the non-possessory rights of the Tribe secured by the 1851 Treaty and aboriginal rights in land that the Pipeline will cross.

85.     Furthermore, the Tribe's free, prior and informed consent is required prior to federal approval of the Pipeline. Indigenous peoples' free, prior and informed consent is a prerequisite for the government taking any action that will affect said peoples. G.A. Res. 61/295, U.N. GAOR, 61st Sess., Supp. No. 49, at 6, U.N. Doc. A/RES/61/295 (2007).

86.     The requirement of free, prior and informed consent stems from treaties and the fiduciary relationship established by virtue of those treaties. It is a heightened standard of consultation which exceeds the requirements imposed by the NHPA and other federal laws because it is the result of the government-to-government relationship between a tribe and the United States established by treaty.

87.     The doctrine of free, prior and informed consent has been internationally codified in the UNDRIP. "States shall consult and cooperate in good faith with the indigenous peoples concerned in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that may affect them." UNDRIP at Article 19.

88.    The Corps and FWS failed to act in good faith with respect to the Tribe in their decisions.

89.    The Corps and FWS failed to obtain the Tribe's consent prior to issuing their decisions.

90.    Because the Corps and FWS failed to obtain the Tribe's free, prior and informed consent prior to issuing their decisions to authorize and permit construction of the Pipeline, their actions were arbitrary, capricious, abuses of discretion, and not in accordance with law and must be held unlawful and set aside pursuant to the APA.

## SECOND CLAIM FOR RELIEF

*Violation of Section 106 of the NHPA, EO 13175, and Agency and Departmental Policies with Respect to Development of the Corps Omaha EA*

91.    Plaintiffs reallege paragraphs 1 through 90 and incorporate them by reference.

92.    In the development of the Corps Omaha EA for the North Dakota Lake Sakakawea and Lake Oahe crossings, Defendant Corps violated the consultation requirements contained in the NHPA, EO 13175, and DOD and Corps policies including Department of Defense Instruction Number 4710.02 ("DOD Instruction") and the United States Army Corps of Engineers Tribal Consultation Policy ("Corps Consultation Policy").

93.    The NHPA requires federal agencies to engage in consultation with Indian tribes prior to any federal undertaking that may affect property of traditional religious and cultural importance to those tribes.  54 U.S.C. § 302706(b).

94.    In 2000, President Clinton issued EO 13175, which requires federal agencies to engage in "meaningful consultation" when engaging in a federal undertaking.  Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000).

95.    The DOD Instruction "implements DoD policy, assigns responsibilities, and provides procedures for DoD interactions with federally-recognized tribes." DOD Instruction at 1.

96.    Pursuant to the DOD Instruction, the DOD's policy is to "[m]eet its responsibilities to tribes as derived from the Federal trust doctrine, treaties, and agreements between the United States Government and tribal governments, and to comply with Federal statutes, regulations, Presidential Memorandums, and Executive Orders governing DoD interactions with tribes." *Id.* at 2.

97.    The DOD Instruction allocates responsibility to heads of DOD components to "[c]onsult with federally-recognized tribal governments on a government-to government basis on matters that may have the potential to significantly affect protected tribal resources, tribal rights, or Indian lands." *Id.* at 4. Furthermore, "[t]he DoD Components shall involve tribal governments early in the planning process for proposed actions that may have the potential to affect protected tribal rights, land, or resources, and shall endeavor to complete consultations prior to implementation of the proposed action. Early involvement means that a tribal government is given an opportunity to comment on a proposed action in time for the tribal government to provide meaningful comments that may affect the decision." *Id.* at 4-5.

98.    The Corps Consultation Policy acknowledges the consultation mandate contained in EO 13175 and requires the Corps to honor and fulfill the federal trust responsibility, address tribal concerns regarding tribal resources, tribal rights (including treaty rights) and Indian lands, protect tribal resources under the Corps' jurisdiction, maintain a government-to-government relationship with tribes, and make tribal consultation an integral process of Corps planning and implementation. *Id.* at 2-3. This necessarily includes taking tribal comments into consideration

with respect to an activity that has potential to significantly affect tribal resources, tribal rights (including treaty rights), and Indian lands.

99. The Corps Consultation Policy defines consultation as an "[o]pen, timely, meaningful, collaborative and effective deliberative communication process that emphasizes trust, respect, and shared responsibility." *Id.* at 2.

100. Additionally, upon information and belief, the Corps has been relying on a consultation process set forth in the amended Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act of 2004 ("PA") to fulfill its NHPA section 106 duties. The PA narrowly applies to the Corps' actions involved with "the ongoing operation and maintenance of the Missouri River system of main stem dams," a scope which does not include the section 408 permits.

101. Further, the Yankton Sioux Tribe is not a signatory to the PA.

102. The requirements of the PA cannot replace the NHPA's section 106 requirements. To the extent that the consultation process followed by the Corps varies from the requirements of section 106, this process is unlawful and cannot substitute for the section 106 process with respect to the Tribe.

103. To date, the Corps has not engaged in meaningful consultation with the Tribe or consultation that meets the definition contained in the Corps Consultation Policy.

104. As a result of the Corps' failure to consult with the Tribe, the Corps' findings of "No Historical Properties Affected" were "premature, based on an incomplete identification effort, which was not sufficiently informed by the knowledge and perspective of consulting parties, including federally recognized Indian tribes who ascribe religious and cultural significance to

properties in the APE that may be affected," as stated in a letter from the Advisory Council on Historic Properties ("ACHP") to the Corps dated May 19, 2016.

105.    On May 18, 2016, representatives from the Corps Omaha District attended a pre-consultation meeting with the Tribe at the Tribe's request in order to lay the groundwork for consultation on the EA regarding the Lake Sakakawea and Lake Oahe crossings in North Dakota. The Corps agreed with the Tribe that the meeting would not be deemed "consultation."

106.    The May 18, 2016 meeting was the first and only meeting between the Tribe and the Corps regarding DAPL.

107.    The Tribe was in the process of developing Tribal Consultation Protocols to govern consultation between the Tribe and federal agencies at the time of the pre-consultation meeting. The Corps was notified of this fact during the pre-consultation meeting and in a follow-up letter from the Tribe indicating that the Tribal Consultation Policies were forthcoming.

108.    The Corps issued the Corps Omaha EA and the Corps Omaha FONSI before the Tribe had an opportunity to provide the Corps with its Tribal Consultation Protocols and engage in meaningful consultation with the Corps.   The Corps denied the Tribe the opportunity to comment on the proposed action in time for the Tribe to provide meaningful comments that may affect the Corps' decision.

109.    In its letter of May 19, 2016 to the Corps, the ACHP stated that "the Corps does not appear to have adequately consulted with the tribes regarding the identification and assessment of eligibility and effects on properties of religious and cultural significance to them that may be affected by the undertaking in PCN areas in the vicinity of water crossings within the project ROW that the applicant assumes will not require PCNs under General Conditions 20 and 31 of the Nationwide Permit protocols, and in the larger undertaking between water crossings."

110.    The ACHP repeatedly alerted the Corps that their segmented approach was resulting in inadequate and fragmented consultation, yet the Corps took no action to remedy its blatant consultation failure.

111.    As the ACHP concluded in its May 19, 2016 letter to the Corps, "[t]he segmented oversight by three Corps districts and a Corps Civil Works facility has resulted in disjointed and inadequate consultation with Indian tribes who may ascribe religious and cultural significance to historic properties that may be affected by the undertaking."

112.    To date, the Corps has not engaged in meaningful consultation with the Tribe regarding the section 408 permits for the Pipeline's Lake Sakakawea and Lake Oahe crossings.

113.    Defendant Corps' failure to comply with the consultation requirements contained in the NHPA, EO 13175, the DOD Instruction, and the Corps Consultation Policy resulted in a FONSI that was arbitrary, capricious, an abuse of discretion, and not in accordance with law and which must be held unlawful and set aside pursuant to the APA.

## THIRD CLAIM FOR RELIEF

*Violation of Section 106 of the NHPA, EO 13175, and Agency and Departmental Policies with Respect to Issuance of Nationwide Permit 12*

114.    Plaintiffs reallege paragraphs 1 through 113 and incorporate them by reference.

115.    In issuing NWP 12, Defendant Corps violated the consultation requirements contained in the NHPA, EO 13175, and the DOD and Corps policies including the DOD Instruction and the Corps Consultation Policy.

116.    On March 19, 2012, the Corps approved 50 NWPs, including NWP 12.

117.    The Tribe was unaware that the Corps was considering approving NWP 12 before it was approved.

118.    The Corps failed to consult with the Tribe regarding the approval of NWP 12.

119.   Upon information and belief, no attempt was even made by the Corps to consult with the Tribe regarding NWP 12.

120.   Defendant Corps' failure to comply with the consultation requirements contained in the NHPA, EO 13175, the DOD Instruction, and the Corps Consultation Policy resulted in the decision to approve NWP 12 which was arbitrary, capricious, an abuse of discretion, and not in accordance with law and which must be held unlawful and set aside pursuant to the APA.

## FOURTH CLAIM FOR RELIEF

*Violation of Section 106 of the NHPA, E.O. 13175, and Agency and Departmental Policies with Respect to Verification of PCNs*

121.   Plaintiffs reallege paragraphs 1 through 120 and incorporate them by reference.

122.   Upon information and belief, on July 25, 2016, the Corps issued letters verifying the more than 200 PCNs for the Project located in North Dakota, South Dakota, Iowa, and Illinois without meaningfully consulting with the Tribe in violation of the NHPA, EO 13175, and DOD an Corps policies including the DOD Instruction and the Corps Consultation Policy.

123.   The Corps has alleged that it was not required to comply with section 106 of the NHPA with respect to the PCN verifications because it claims that it complied with the NHPA when it issued NWP 12.

124.   As previously stated, the Tribe was not consulted regarding issuance of NWP 12 in 2012; therefore, the Corps could not possibly have complied with the NHPA for purposes of the PCN verifications.

125.   Upon information and belief, no cultural resource studies were conducted at the more than 200 PCN sites when NWP 12 was approved.

126.     When it issued NWP 12, the Corps unlawfully purported to transfer its section 106 duties under the NHPA to private parties, such as Dakota Access, LLC, seeking approval for projects such as DAPL.

127.     Under NWP 12, the Corps only addresses historic impacts if the project proponent alerts the Corps that historical properties would be affected.

128.     At no time did the Corps even attempt to initiate consultation with the Tribe with respect to the more than 200 PCN sites along the route of the Pipeline, at least eleven of which are on the Tribe's aboriginal title lands.

129.     Defendant Corps' failure to complete the section 106 process with regard to the PCNs and to comply with the consultation requirements contained in the NHPA, EO 13175, the DOD Instruction, and the Corps Consultation Policy resulted in verifications of more than 200 PCNs that were arbitrary, capricious, an abuse of discretion, and not in accordance with law and which must be held unlawful and set aside pursuant to the APA.

### FIFTH CLAIM FOR RELIEF

*Violation of the NHPA in Defining the Area of Potential Effects*

130.     Plaintiffs reallege paragraphs 1 through 129 and incorporate them by reference.

131.     Defendant Corps violated the NHPA by defining the area of potential effects ("APE") for the Pipeline in the Corps Omaha EA and the Corps St. Louis EA unlawfully narrowly, excluding from the APE the majority of the Pipeline route, all of which would be affected by the Corps' actions to approve section 408 permits.

132.     In performing an EA, the NHPA requires an agency to determine "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties," which constitutes the APE.  36 C.F.R. § 800.4(a)(1).

133.    "Undertaking" is defined in the ACHP regulations as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance, and those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y).

134.    In this instance, the undertaking (the project requiring a federal permit) is construction of the Pipeline.

135.    The APE, therefore, is the geographic area or areas within which construction of the Pipeline may directly or indirectly cause alterations in the character or use of historic properties.

136.    Even if the undertaking is defined as construction of the Pipeline at the locations where Corps authorization is required, the APE still encompasses a much broader area than just those locations, as the scope of the APE must include the geographic area or areas within which the undertaking may have direct or indirect effects on historic properties.

137.    In the Corps EAs, the Corps determined the APE unlawfully narrowly, limiting the geographical scope of the EAs to the crossings of Corps-owned lands and flowage easements.

138.    In both EAs, the Corps failed to consider construction of the Pipeline as the undertaking and failed to consider direct and indirect effects of construction of the Pipeline in its analyses in violation of the ACHP regulations.

139.    The clearing, grading, excavation, and construction that would occur along the duration of the Pipeline route would destroy any historic or culturally significant sites encountered.

140.    Given the history and the nature of the land where these activities would occur, such destructive encounters are highly likely because, as the Corps admitted in the Corps Omaha

EA, "much of the region has been inhabited by human populations for approximately 12,000 years . . . . The current Project Area has a moderate to high probability for archaeological deposits based on proximity to permanent water sources, topography, lack of significant ground disturbances, and depositional processes." Corps Omaha EA at 76.

141.    Upon information and belief, ancient burials are located at or in the immediate vicinity of the Pipeline's Lake Oahe crossing.

142.    Upon information and belief, the remains of an *Ihanktowanna*, or "Yanktonai," camp are located at or in the immediate vicinity of the Pipeline's Lake Oahe crossing.  The *Ihanktowana* are closely related to the *Ihanktonwan*, or "Yankton."

143.    Upon information and belief, the remains of an Arikara camp are located at or in the immediate vicinity of the Pipeline's Lake Oahe crossing.

144.    Upon information and belief, multiple cairns are located at or in the immediate vicinity of the Pipeline's Lake Oahe crossing.

145.    Upon information and belief, numerous burials are located on the Pipeline route where it crosses the Big Sioux River Wildlife Management Area in Iowa.

146.    The APEs as defined by the Corps in both of the EAs were unlawfully limited to the "permit area" and excluded the vast majority of the Pipeline route, all of which may affect historical and cultural properties and despite the fact that the Pipeline cannot be completed without the Corps issuing permits and approvals.

147.    In determining the level of effort required for assessing potential effects, including defining the APE, the section 106 regulations instruct agencies to consider the degree of federal involvement.  36 C.F.R. § 800.4(b)(1).

148.    The ACHP pointed out the need for the Corps to expand the unlawfully narrow scope of the APE in a letter dated March 15, 2016, stating:

> Given the sheer number of individual permits and the unlikelihood that the pipeline could be constructed but for the issuance of these numerous permits, it is unclear how the Omaha District concluded that its jurisdiction and responsibilities to assess environmental impacts from the broader undertaking are limited only to the 209 crossings.  We urge the Corps to consider expanding its review of this undertaking by redefining the area of potential effects (APE) consistent with 36 CFR Section 800.16(d) of our regulations, "Protection of Historic Properties" (36 CFR Part 800).

149.    In addition, as the ACHP asserted in a letter to the Corps dated May 6, 2016, "[i]n the case of DAPL, three Corps regulatory offices, a Corps Civil Works facility, the Farm Service Agency, and the United States Fish and Wildlife Service all have actions related to portions of the larger undertaking.  Accordingly, it appears that the level of federal involvement justifies a greater federal effort to identify and evaluate historic properties."

150.    Furthermore, the ACHP letter stated, "the pipeline could not be constructed 'but-for' the Corps permits required."

151.    The Corps therefore should have defined the APE to include the entire geographical area within which construction of the Pipeline may directly or indirectly affect historic properties.

152.    The Corps has erroneously taken the position that its review of the Pipeline for purposes of the NHPA is governed solely by 33 C.F.R. § 325 Appendix C ("Appendix C"), which purports to limit the required scope of agency review to the "permit area" (33 C.F.R. app. C (5)(f)), rather than by the ACHP regulations.

153.    While federal agencies are permitted to promulgate their own section 106 regulations, such regulations must be consistent with the ACHP regulations and must be approved by the ACHP.  54 U.S.C. § 306102(b)(5); 36 C.F.R. § 800.14(a)(1)-(2).

154.   Appendix C conflicts with the ACHP regulations governing the scope of required agency review.

155.   Furthermore, the ACHP has never approved Appendix C.

156.   The Corps' reliance on Appendix C in place of the ACHP regulations violates the NHPA and has resulted in a grossly inadequate review of the Pipeline under the NHPA, jeopardizing the Tribe's vast cultural and historic resources that lie in the path of the Pipeline's destruction.

157.   Because the Corps failed to properly define the APE and instead excluded geographic areas within which construction of the Pipeline may directly or indirectly cause alterations in the character or use of historic properties, the Corps failed to provide a complete cultural and historic resource analysis or properly assess the potential effects of the Pipeline as required by the NHPA.

158.   The Corps' reliance upon regulations which were required to be approved but which were not approved by the ACHP is a violation of the NHPA.

159.   The Corps' lack of consideration of a significant portion of the potential effects of the Pipeline due to the unlawfully narrow scope of the EAs violated the NHPA and resulted in FONSIs that were arbitrary, capricious, abuses of discretion, and not in accordance with law and which must be held unlawful and set aside pursuant to the APA.

## SIXTH CLAIM FOR RELIEF

*Violation of NEPA and APA for Unlawful Segmentation of Project Components, Failing to Adequately Consider Indirect and Cumulative Impacts, and Failing to Meaningfully Involve the Tribe on a Government-to-Government Basis in an Effort to Achieve Environmental Justice Obligations*

160.   Plaintiffs reallege paragraphs 1 through 159 and incorporate them by reference.

161.    Federal Defendants' numerous Federal authorizations and decisions served as a condition precedent to accomplishment of the Pipeline and triggered NEPA's requirement for production of an Environmental Impact Statement ("EIS") and should have been analyzed in a single NEPA document.

162.    NEPA requires production of an EIS for all "major Federal actions significantly affecting the quality of the human environment…" 42 U.S.C. §4332(B). A federal action "affects" the environment when it "will or may have an effect" on the environment.  40 C.F.R. § 1508.3. An EIS is required if the agency finds that the proposed action may have a significant impact on the human environment.

163.    Council on Environmental Quality ("CEQ") regulations explicitly recognize that agency actions that are determined to have a "significant" effect on the human environment normally require production of an EIS.  40 C.F.R. §1501.4.

164.    Federal agencies are required to develop, discuss in detail, and identify the likely environmental consequences of proposed mitigation measures.  40 C.F.R. § 1508.25(b); 40 C.F.R. § 1502.14(f); 40 C.F.R. § 1502.16(h); 40 C.F.R. § 1505.2(c).

165.    The NEPA process requires Federal agencies to assess not only the direct impacts of a proposed action, but also the indirect and cumulative impacts of past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  40 C.F.R. §1508.25(c).

166.    NEPA mandates consideration of separate components of a single project in a single NEPA review. 40 C.F.R. §1508.25.  Specifically, NEPA regulations require that connected actions be considered in a single EIS, defining them as actions that "cannot or will not proceed

unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification."

167. Guidance promulgated by the CEQ elucidates the responsibilities of Federal agencies to achieve environmental justice obligations in the context of NEPA compliance. These include: consideration of "the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action;" development of "effective public participation strategies;" assurance of "meaningful community representation in the process;" and assurance of "tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights." CEQ, Environmental Justice: Guidance under the NEPA 15-16 (1997); *accord* 59 Fed. Reg. 7629 (Feb. 16, 1994) at §§ 1-101, 3-3, and 4-401 (directing agencies to develop policies, programs, procedures, and activities to ensure that minority, low-income and impacted communities are meaningfully involved in environmental decision-making).

168. Here, Federal Defendants have unlawfully piecemealed and segmented approval and analysis of the Pipeline utilizing three separate EAs and FONSIs as well as conducting "verifications" for more than 200 pre-construction notices along the route of the proposed Pipeline – verifications which do not include NEPA analysis or public participation.

169. Federal Defendants issued numerous Federal authorizations and decisions including, but not limited to, the Omaha EA/FONSI, the Corps St. Louis EA/FONSI, the Corps' NWP 12 verifications for more than 200 PCNs along the route of the proposed pipeline as well as the FWS EA/FONSI (collectively, "Federal approvals") served as a condition precedent to accomplishment of the Pipeline.

170.    By piecemealing the Federal approvals and analysis of the Pipeline, Federal Defendants failed to consider the full indirect and cumulative effects of the Pipeline as required by NEPA.

171.    No NEPA document prepared by Federal Defendants and challenged herein analyzes the indirect and cumulative impacts of Pipeline construction.

172.    The Federal approvals did not properly consider the indirect and cumulative impacts of Federal Defendants' actions and the scopes of their reviews were too narrow.

173.    By piecemealing the Federal approvals and analysis of the Pipeline, Federal Defendants failed as a matter of environmental justice to adequately involve the Tribe on a government-to-government basis in the agency's decisionmaking process.

174.    Pursuant to Executive Order 12898 ("EO 12898"), "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 11, 1994).

175.    In the memorandum to heads of all departments and agencies which accompanied EO 12898, President Clinton clarified the environmental justice duties of federal agencies, explaining that "each Federal agency shall analyze the environmental effects, including human health, economic and social effects, of Federal actions, including effects on minority communities and low-income communities, when such analysis is required by [NEPA]." Memorandum from William Clinton, President of the United States, for the Heads of All Departments and Agencies

(Feb. 11, 1994), *available* *at* https://www.epa.gov/sites/production/files/2015-02/documents/clinton_memo_12898.pdf (Last visited Sept. 7, 2016).

176.    Because construction of the Pipeline will result in damage to and destruction of cultural and historical sites of great importance to the Tribe – a minority and low-income community – and because of the spiritual value the Tribe ascribes to the waters of the Missouri River which will be threatened by the Pipeline, the Tribe is disproportionately impacted by Defendants' approvals and authorizations for the Pipeline.  These effects on the Tribe were not analyzed in Defendants' NEPA reviews, resulting in arbitrary and capricious decisions.

177.    The Federal approvals on the whole have a significant impact on the quality of human environment and require production of an EIS.

178.    Federal Defendants' unlawful segmentation of Federal approvals for the Pipeline and failure to analyze the Pipeline's impacts in a single EIS is arbitrary and capricious, an abuse agency discretion, a failure to act in accordance with law and thereby a violation of the APA, 5 U.S.C. § 706(2)(A).

### SEVENTH CLAIM FOR RELIEF

*Violation of the CWA and APA for Failing to Consider the Public Interest When Authorizing the NWP 12 Verifications and PCNs*

179.    Plaintiffs reallege paragraphs 1 through 178 and incorporate them by reference.

180.    The Corps violated the CWA and APA by failing to consider the public interest when authorizing the NWP verifications for the Pipeline.

181.    The CWA provides that the Corps "may issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters" of the United States. 33 U.S.C. § 1344(a).

182.   The statute authorizes the Corps to issue both individual permits on an activity-by-activity basis and general permits on a nationwide basis for certain categories of activities involving discharges of dredged or fill material.  33 U.S.C. § 1344(e)(1).

183.   Such general permits remain in effect for up to five years, and are subject to revocation or modification by the Corps. 33 U.S.C. § 1344(e)(2).

184.   In reliance on this Congressional directive, the Corps has issued a number of NWPs which "are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts. The NWPs are proposed, issued, modified, reissued (extended), and revoked from time to time after an opportunity for public notice and comment." 33 C.F.R. § 330.1(b).

185.   NWPs require the permittee to provide advance notification to the Corps before engaging in an activity that it believes to be within the scope of the NWP.  The Corps' District Engineer ("DE") "will review the notification and may add activity-specific conditions to ensure that the activity complies with the terms and conditions of the NWP and that the adverse impacts on the aquatic environment and other aspects of the public interest are individually and cumulatively minimal." 33 C.F.R. § 330.1(e)(2); *see also* 33 C.F.R. § 330.6(a)(3)(i) ("The DE may add conditions on a case-by-case basis to clarify compliance with the terms and conditions of an NWP or to ensure that the activity will have only minimal individual and cumulative adverse effects on the environment, and will not be contrary to the public interest.").

186.   This review process may culminate in the DE issuing a verification to the permittee, thereby allowing the activity to move forward.

187.   The NWP of interest in this case is NWP 12, which the Corps issued on February 21, 2012. *See* 77 Fed.Reg. 10,184. By its terms, "[t]his NWP authorizes the construction, maintenance, or repair of utility lines ... and the associated excavation, backfill, or bedding for the

utility lines, in all waters of the United States, provided there is no change in preconstruction contours." 77 Fed.Reg. 10,271.

188. NWP 12 requires the permittee to submit a PCN to the Corps if certain criteria are present.

189. Corps rules specify that "[t]o qualify for NWP authorization, the prospective permittee must comply with ... general conditions" enumerated therein. 77 Fed.Reg. 10,282.

190. The agency rule enumerates 31 general conditions. Of those, General Condition 31 states that "[i]n reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." 77 Fed. Reg. at 10,287.

191. In conducting a public interest review, the Corps must consider the probable impacts of the proposed action and weigh "all those factors which become relevant." 33 C.F.R. § 320.4(a). The Corps must balance the benefits "which reasonably may be expected to accrue" from the action against the reasonably foreseeable detriments. *Id.* "All factors" which may be relevant to the proposal must be considered, including the extent of the public and private need for the proposal, and the existence of unresolved conflicts around the resource use. The DE is authorized to make an "independent review of the need for the project from the perspective of the overall public interest." *Id.* § 320.4(g).

192. The Corps failed to perform a sufficient public interest review in its verification of PCNs for North Dakota, South Dakota, Illinois, and Iowa.

193. Specifically, the Corps conducted an arbitrary and segmented approach that ignored virtually all of the indirect and cumulative effects of its decision, specifically, the construction and

31

operation of the Pipeline itself including, but not limited to, an arbitrary and one-sided economic balance in which the benefits of the entire Pipeline were weighted against the impacts of tiny segments of the pipeline.

194.     The Corps' failure to perform a sufficient public interest review in its verification of PCNs for North Dakota, South Dakota, Illinois, and Iowa is arbitrary and capricious, an abuse agency discretion, a failure to act in accordance with law and thereby a violation of the APA, 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

Based upon the foregoing allegations, the Tribe respectfully prays that the Court grant the following relief:

<u>PRAYER FOR DECLARATORY RELIEF:</u>

A.     Enter an order declaring that the Corps Omaha EA was unlawfully developed and the Corps Omaha FONSI was unlawfully issued in violation of section 106 of the NHPA, EO 13175, the DOD Instruction, and the Corps Consultation Policy.

B.     Enter an order declaring that NWP 12 was unlawfully issued in violation of section 106 of the NHPA, EO 13175, the DOD Instruction, and the Corps Consultation Policy.

C.     Enter an order declaring that the PCNs for the Pipeline were unlawfully verified in violation of section 106 of the NHPA, EO 13175, the DOD Instruction, and the Corps Consultation Policy.

D.     Enter an order declaring that the Corps' definition of the APE was unlawful and violated the NHPA.

E.      Enter an order declaring that the Omaha EA/FONSI, the Corps St. Louis EA/FONSI, the Corps' NWP 12 verifications for more than 200 PCNs along the route of the proposed Pipeline, as well as the FWS EA/FONSI were unlawfully issued in violation of NEPA.

F.      Enter an order declaring that the Corps and FWS violated NEPA by unlawfully segmenting their review of the Pipeline.

G.      Enter an order declaring that the Corps failed to conduct a sufficient public interest review prior to authorizing the NWP 12 verifications and PCNs, thereby violating the CWA.

H.      Enter an order declaring that the Corps and FWS violated the 1851 Treaty, the federal agencies' respective trust responsibilities to the Tribe, and the UNDRIP by approving and permitting construction of the Pipeline through the Tribe's treaty territory without its free, prior and informed consent.

PRAYER FOR VACATUR:

I.      Enter an order vacating the Corps Omaha EA and the Corps Omaha FONSI.

J.      Enter an order vacating all PCN verifications for the Pipeline.

K.      Enter an order vacating NWP 12 as applied to the Pipeline.

L.      Enter an order vacating the Corps St. Louis EA and the Corps St. Louis FONSI.

M.      Enter an order vacating the FWS EA and the FWS FONSI.

PRAYER FOR INJUNCTIVE RELIEF:

N.      Enter an Order enjoining Defendant Corps from re-granting and re-issuing the Corps Omaha EA and the Corps Omaha FONSI, the PCN verifications, and NWP 12 unless and until procedural and substantive requirements contained in the NHPA, EO 13175, EO 12898, Corps and DOD policies have been met, and retain jurisdiction over this matter to ensure that Defendant Corps complies with applicable law.

33

O.  Enter an Order enjoining Defendant Corps and Defendant FWS from re-granting and re-issuing the Omaha EA/FONSI, the Corps St. Louis EA/FONSI, the Corps' NWP 12 verifications for more than 200 PCNs along the route of the proposed Pipeline as well as the FWS EA/FONSI unless and until procedural requirements contained in NEPA have been met, and retain jurisdiction over this matter to ensure that Defendant Corps and Defendant FWS comply with applicable law.

P.  Enter and Order enjoining Defendant Corps from re-granting and re-issuing the Corps' NWP 12 verifications for more than 200 PCNs along the route of the proposed Pipeline unless and until procedural and substantive requirements contained in the CWA have been met, and retain jurisdiction over this matter to ensure that Defendant Corps complies with applicable law.

PRAYER FOR ATTORNEYS FEES AND COSTS:

Q.  Award Plaintiffs their reasonable fees, costs, expenses associated with bringing this case.

PRAYER FOR OTHER RELIEF:

R.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 8th day of September, 2016,

FREDERICKS PEEBLES & MORGAN LLP

Patricia A. Marks, DCBA #446702
Fredericks Peebles & Morgan LLP
401 9th Street, N.W., Suite 700
Washington, D.C. 20004
Phone: (202) 450-4887
Facsimile: (202) 450-5106
pmarks@ndnlaw.com
*Attorneys for Plaintiffs*

Jennifer S. Baker, OKBA# 21938
(*Pro Hac Vice Application Pending*)
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Facsimile: (303) 673-9155
jbaker@ndnlaw.com
*Attorneys for Plaintiffs*

/s/ Brad A. Bartlett
Brad A. Bartlett, COBAR #32816
(*Pro Hac Vice Application Pending*)
University of Denver
Environmental Law Clinic
2225 E. Evans Ave., Suite 335
Denver, CO 80208
Phone: (303) 871-7870
bbartlett@law.du.edu
*Attorneys for Plaintiffs*

## ACRONYMS

ACHP - Advisory Council on Historic Preservation
APA - Administrative Procedures Act
APE - Area of Potential Effects
CEQ - Council on Environmental Quality
CWA - Clean Water Act
DAPL - Dakota Access Pipeline
DE - District Engineer
DOD - Department of Defense
EA - Environmental Assessment
EIS - Environmental Impact Statement
FONSI - Finding of No Significant Impact
FWS - U.S. Fish and Wildlife Service
NHPA - National Historic Preservation Act
NEPA - National Environmental Policy Act
NWPs - Nationwide Permits
PA - Programmatic Agreement for the Operation and Management of the Missouri River Main
Stem System for Compliance with the National Historic Preservation Act of 2004
PCN - pre-construction notification
RHA - Rivers and Harbors Act
SUP - Special Use Permit
THPO - tribal historic preservation officer
UNDRIP - United Nations Declaration on the Rights of Indigenous Peoples